**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

John Doe,                                              )
                                                       )
                          Plaintiff,                   )
                                                       )         Case No.: 16-cv-7642
              v.                                       )
                                                       )         Honorable Joan B. Gottschall
School District 214, et al.,                           )
                                                       )
                          Defendants.                  )

**MEMORANDUM OPINION AND ORDER**

Plaintiff John Doe ("Doe"),[1] an African American male, attended Prospect High School

("Prospect" or "Prospect High School") in suburban Mount Prospect, Illinois, from 2011 until he

graduated on time in 2015. *See* Pl.'s Renewed R. 56.1(a)(3) Stmt. in Resp. to Movant's [sic]

Stmt. of Material Facts ("Resp. to SMF") ¶ 38, ECF No. 59; Defs.' Resp. to Pl.'s

R. 56.1(b)(3)(C) Stmt. of Add'l Facts ("Resp. to SAF") ¶ 9, ECF No. 61. Prospect "had an

overwhelmingly Caucasian student body" at the time. Resp. to SAF ¶ 8 (undisputed). In this

litigation, Doe claims that students and staff at Prospect bullied and harassed him on account of

his race and sexual orientation, and school and district staff turned a "blind eye" to it, minimized

his and his family's complaints, and disciplined Doe more harshly than his white classmates for

comparable infractions. *See* Compl. ¶¶ 1–7, ECF No. 1-1. Doe brings claims under Illinois law

alleging that defendants' conduct was willful and wanton, a claim under Illinois law for

---

[1] At the pleading stage, defendants moved to strike plaintiff's use of a fictitious name in order to force him to litigate in his proper name. After balancing the public and private interests required by Seventh Circuit law, this court permitted plaintiff to proceed under a pseudonym. *See* Order at 9–11, ECF No. 20 (Mar. 24, 2017) (quoting *Doe v. City of Chicago,* 360 F.3d 667, 669 (7th Cir. 2004)) (other citation omitted). On balance, the court found that the "plaintiff's age, the nature of his complaints, the fact that he accuses many other young people of racist behavior and the fact that he has multiple disabilities all justify the use of a pseudonym in this case." *Id.* at 10. Defendants have not renewed their objection to plaintiff's use of a fictitious name, and the accusations and evidence in the summary judgment record further convince the court that allowing plaintiff to use a fictitious name remains justified. In order to avoid easily identifying Doe, the court does not refer to his family members by name.

intentional infliction of emotional distress, and claims under 42 U.S.C. § 1983 and Title VI of the

Civil Rights Act of 1964.  Defendants move for summary judgment on all claims.  ECF No. 55.

For the reasons discussed below, the court grants defendants' motion for summary judgment on

Doe's § 1983 and Title VI claims and relinquishes supplemental jurisdiction over his claims

under Illinois law.  *See* 28 U.S.C. § 1367(c)(3).

## I.  Background

Because this case comes before the court at summary judgment, the court recites the facts

in the light most favorable to Doe, the nonmoving party, and draws all reasonable inferences

from those facts in his favor.  *E.g.*, *Donald v. Wexford Health Sources, Inc.,* 982 F.3d 451, 457

(7th Cir. 2020) (citing *Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018)).

### A.  *Parties*

Doe has sued the Illinois school district with authority over Prospect, School District 214

("the district").  *See* Compl. ¶¶ 11-12; Resp. to SMF ¶ 34.  The complaint also names as

defendants the district superintendent, David Schuler ("Schuler"), and several Prospect

administrators, faculty, and staff: Kurt Laakso[2] ("Laakso"), Prospect's principal until

August 2013; Michelle Dowling ("Dowling"), Prospect's principal after August 2013;

Mark Taylor ("Taylor"), a dean of students at Prospect; Suzette Sanecki ("Sanecki"), a teaching

assistant at Prospect; and three "Doe teachers" at Prospect.  *See* Compl. ¶¶ 13-18; Resp. to SMF

¶¶ 58-62.

All agree that "Prospect High School is one of [the district]'s highest-performing flagship

schools."  Resp. to SMF ¶ 34.  Black students like Doe and his sister "were a minority" at

Prospect, which was "overwhelmingly Caucasian" at the time Doe attended.  Resp. to SAF ¶¶ 8,

---

[2] Defendants represent that the complaint incorrectly lists Laakso's name as "Kirk Laxo."  *E.g.,* Defs.' Mem. Supp.
Mot. Summ. J. 1.

9.  Doe identifies as gay, and, with inferences favorable to him, he testified at his deposition that his sexual orientation was obvious and known to everyone at Prospect High School.  *See* Doe Dep. 271:16-272:5, Defs.' Ex. A, ECF No. 56-1.

While at Prospect, Doe received services intended to accommodate a cognitive disability that caused him "difficulty with reading, math, and comprehension."  Resp. to SAF ¶ 1; *accord* Resp. to SMF ¶ 39.  Doe also has a seizure disorder.  Resp. to SMF ¶ 40.  Defendants Dowling and Sanecki were aware of Doe's seizure disorder.  Resp. to SAF ¶ 7.

A reasonable factfinder could conclude that some Prospect staff members found Doe's mother[3] intimidating and attempted to avoid conflict with her.  *See* Resp. to SAF ¶¶ 65-67.  Defendants dispute any inference that staff members' perception of Doe's mother resulted in differential treatment of Doe.  *See id.*

## B.  The District's Written Policies, Training, and Programs

The parties agree that several written policies of the district are pertinent to the facts of this case.  First and foremost, the district adopted a bullying prevention and harassment policy ("bullying policy") in 2010 and updated it in 2014.[4]  Resp. to SMF ¶ 4.  The policy protects students from bullying based on several protected categories including race and sexual orientation.  Resp. to SMF ¶ 6.  The district also adopted policies on the use of expulsion and

---

[3] The person referred to by many witnesses as Doe's mother was Doe's legal guardian.  Resp. to SMF ¶ 49 (undisputed).  Like the parties, the court refers to her as Doe's mother.

[4] The summary judgment record contains a copy of the bullying policy adopted September 14, 2014, and last revised September 3, 2015, after Doe graduated.  Defs.' Ex. G, ECF No. 56-7.  The material facts concerning the bullying policy's contents discussed in the text of this opinion and applicable during the period in which Doe was a student at Prospect are not in dispute.  *See* Resp. to SMF ¶¶ 4-6.  The parties also agree that the bullying policy is reviewed at least annually by an advisory council and that "various parent teacher organizations meet three to four times a year and talk about the bullying" policy.  Resp. to SMF ¶¶ 12-13.  The court does not know whether the district revised the bullying policy, or any other written policy, during Doe's four years at Prospect.  Accordingly, the court implies no findings about the contents of the district's written bullying policies at any time, beyond the undisputed facts stated at a high level of generality in the text.

suspension to discipline students in 2013 and 2014, respectively.  Resp. to SMF ¶ 8; Defs.' Ex. I,

ECF No. 56-9.  In addition, the district has adopted written policies on accommodating

individuals with disabilities, providing equal educational opportunities, handling student medical

issues, and reporting incidents of suspected child abuse and neglect to the Illinois Department of

Children and Family Services.  Resp. to SMF ¶ 9.  However, the written policies defendants have

submitted here bear revision dates showing them to be in effect after Doe graduated from

Prospect at the end of the 2014-15 school year.  *See* Defs.' Ex. J, ECF No. 56-10

(accommodation policy adopted Jan. 5, 2017; equal educational opportunities policy revised

Dec. 10, 2015; internet safety policy revised Apr. 7, 2016; abused and neglected child reporting

policy adopted Dec. 10, 2015).

As explained in the footnote to the previous paragraph, the summary judgment record

also lacks a copy of the district's bullying policy adopted in 2010.  It is nonetheless undisputed

that at all relevant times the district's bullying policy specified a process for complaining about

bullying and listed name and contact information of school officials to whom bullying

complaints were to be directed.  Resp. to SMF ¶ 5.  The district also has a uniform grievance

procedure allowing a student, parent, or guardian to file a formal complaint alleging that a

student or parent's state or federal rights have been violated.  Resp. to SMF ¶ 10; *see also*

Uniform Grievance Procedure, Defs.' Ex. K, ECF No. 56-11 (adopted Jan. 6, 2011, revised

Sept. 3, 2015).  It is undisputed that repeated use of the words "nigger" and "faggot" would be

considered violations of the bullying policy and that staff would be expected to contact the dean

and parents, as well as issue a minimum of an in-school suspension, if a student repeatedly used

those words.  Resp. to SAF ¶¶ 76-77.

In addition to written policies, Prospect High School "has bullying [prevention] and diversity awareness programs in place for students." Resp. to SMF ¶ 36. Each year, the district runs a "behavior campaign" during which it "actively educates and encourages students to report inappropriate behavior." Resp. to SMF ¶ 16. And each school has a principal's advisory council, which is a forum at which concerns about bullying can be raised. *See* Resp. to SMF ¶ 17.

District administrators have a "wide variety" of disciplinary options for student misconduct, such as bullying, including: a conference with the student, restorative justice, loss of privileges, and in or out of school suspension. Resp. to SMF ¶¶ 21-22. "When disciplining students, [the district's] focus is to change behavior in addition to righting the situation." Resp. to SMF ¶ 20 (undisputed). In some instances, policy dictates the discipline to be meted out, while administrators have discretion in others. *See* Resp. to SMF ¶ 25 (genuinely disputed fact); Resp. to SAF ¶ 73, 75-83. If a teacher bullies a student, the teacher can be disciplined with consequences ranging from a verbal reprimand to dismissal. Resp. to SAF ¶ 82.

District employees have received training on diversity, racial sensitivity, harassment, and handling student medical issues. *See* Resp. to SMF ¶ 19. Prospect High School in particular "has several annual programs for its staff regarding bullying and diversity awareness." Resp. to SMF ¶ 37 (undisputed).

### C. Documented Incidents of Bullying and Harassment

Depending on how they are counted, Doe identifies 12 or 13 incidents in which he alleges he experienced bullying or discrimination at the hands of Prospect students, faculty, and staff. *See* Resp. to SMF ¶ 50; Resp. to SAF ¶ 13. The court refers to these as documented incidents because they are reported in the district's written records. These include: (1) an incident in

which defendant Sanecki struck Doe in the back of the head in class; (2) Doe's suspension for allegedly touching a girl's genitals; (3) an incident in which a non-party teacher ejected Doe from study hall and had him transferred to another teacher; (4) an incident in which Doe was locked in the attendance office; (5) an incident in which a girl in the cafeteria gave Doe the middle finger; (6) an incident in which Doe called a girl "fat because she called [him] a fag;" (7) an incident in which a non-party teacher, Ms. Davis, called Doe a jerk in class; (8) an incident in which a non-party teacher, Mr. Stokes, sent Doe to the dean's office; (9) an incident in the cafeteria in which a student named Vince called Doe a "nigger;" (10) an incident in which students on the school bus threw a water bottle at Doe; (11) an incident in which Doe was forced to delete a video he took of girls fighting; and (12) two separate incidents in which Doe had a dispute with a student named Anthony (though it is not clear whether the same student named Anthony was involved in both incidents). *See* Resp. to SAF ¶ 13; Doe Dep. 50:12–52:23. Defendants do not dispute that each of these incidents was reported to Prospect staff, but they dispute whether their handling of those reports was discriminatory. *See* Resp. to SAF ¶ 13.

Doe testified about these incidents at length at his deposition. *See* Doe Dep. 154–204. Four of these incidents are summarized in the following paragraphs in the light most favorable to Doe.

In late December 2011, defendant Sanecki, a teaching assistant in Doe's biology class, smacked Doe on the back of the head after she discovered that he had not completed his homework. *See* Resp. to SAF ¶ 52. Sanecki agreed that there were other students in the class who did not have their homework, and Doe testified that he never saw any white students struck. *See* Resp. to SAF ¶¶ 52, 57 (citing Sanecki Dep. 26:15-20, Pl.'s Ex. H, ECF No. 59-8). How much force Sanecki used is disputed. *See* Resp. to SAF ¶ 52. Doe testified that she hit him hard

6

in the back of the head. *Id.* Sanecki testified that she tapped him lightly. Sanecki Dep 28:15-29:12. Doe's mother told defendants Laakso and Schuler that she believed Sanecki's conduct was severe and that it put Doe at risk for seizures. Resp. to SAF ¶ 56. Sanecki received no formal discipline for this incident, and school administrators permitted her to continue assisting in Doe's biology class. *See* Resp. to SAF ¶¶ 53-54.

Another incident occurred on or around March 1, 2012. Resp. to SAF ¶ 32. School administrators suspended Doe based on an allegation that he touched a white female student's genitals through her clothing. Resp. to SAF ¶¶ 32, 36. Defendants did not allow Doe to tell his side of the story before suspending him.[5] Resp. to SAF ¶ 36. Doe's mother testified that while Doe was suspended, the female student whom Doe allegedly inappropriately touched sent Doe a social media message saying that "she was sorry, it was a joke, and she liked him." *See* Resp. to SAF ¶ 37. Doe and his mother interpreted this message as a recantation. *See* Resp. to SAF ¶¶ 37, 38. Doe's mother brought the message to Laakso's attention, Resp. to SAF ¶ 38 (disputed), but, with inferences favorable to Doe, Laakso did not take the message seriously, did not contact Doe's accuser, and did not investigate further. *See id.*

In the third incident, a security guard escorted Doe from an afterschool club meeting and locked him in a dark attendance office. *See* Resp. to SAF ¶ 33. The guard left Doe in the office until Doe's mother came to pick him up from school. *See id.* ¶¶ 33-35. Defendants submit uncontradicted testimony that the attendance office's door can be locked to prevent someone from entering, but for safety reasons someone inside the office can always open the door and leave the room. *See* Resp. to SMF ¶ 55. The record contains no evidence that Doe knew that he could open the door, however.

---

[5] Although defendants cite material ostensibly to create a factual dispute on this point, the cited evidence does not support the proposition for which it is cited. *See* Resp. to SAF ¶ 36 and material cited in response.

Finally, in early December 2011, a non-party teacher ("Ms. Davis") told Doe to "stop acting like a jerk" in class. Resp. to SAF ¶ 58; Doe Dep. 79:2-80:11. Doe never heard this teacher call a white student a jerk. Resp. to SAF ¶ 58. Doe testified that he did not remember reporting this incident to anyone. Doe Dep. 81:5-11. However, Laakso testified that his notes reflected that Doe's mother contacted him about this incident, and Laakso discussed the matter with the teacher. *See* Laakso Dep. 33:12-36:8, Defs' Ex. B, ECF No. 56-2.

### D. Additional Evidence of Bullying and Harassment

Doe has submitted disputed evidence that, seen in the light most favorable to him, shows that undocumented incidents of bullying and harassment were reported to school officials. Doe in most cases has failed to make clear the identity of the students involved, nor the time of the incident, nor the substance of the incident, nor the official to whom the incident was reported. Doe testified that at least five students called him a "nigger" a total of at least 30–50 times during his four years at Prospect. *See* Resp. to SAF ¶ 18. One student called him a "porch monkey." *Id.* ¶ 23. A group of students also regularly called Doe "fag" and "faggot." *See id.* ¶¶ 17, 20. When asked whether any faculty or staff witnessed these incidents or whether Doe reported them to faculty or staff, Doe replied that he did not remember. *See* Doe Dep. 269:24-271:9. However, Doe testified that he told his mother "each time" a student used one of these slurs. *See id.* at 270:12-14, 271:10-12. Taken favorably to Doe, his mother's testimony establishes that she reported each of those incidents to school administrators. *See* Mother Dep. 33:6–18, Pl.'s Ex. E, ECF No. 59-5. Thus, a jury could find that Doe's mother reported additional incidents of the use of slurs against Doe. *See* Resp. to SAF ¶¶ 17–23.

Doe's older sister, who is also black, attended Prospect with Doe during his freshman year and her senior year (2011-2012). *See* Sister Dep. 9:8-11, Pl.'s Ex. J, ECF No. 59-10. She testified that she experienced disparate treatment by students, teachers, and security guards during her time at Prospect. *See* Resp. to SAF ¶ 11. She described incidents in which students called her "nigger," a teacher told her to "sit her black ass down," she was refused access to the elevator when she had a broken leg, and was disciplined for leaving campus during school hours while the white friend who left campus with her was not punished. *See id*.

### E. Plaintiff's Claims

The complaint has eight counts. *See* Compl. 45. The first three arise under Illinois law. In counts I and II, Doe brings claims under the Illinois Tort Immunity Act's exception making public officials liable for "willful and wanton" conduct in the execution or enforcement of a law. *See* 745 Ill. Comp. Stat. § 10-202; Compl. 18-20. Doe pleads an intentional infliction of emotional distress claim in count III. Compl. 20-22.

Doe brings counts IV–VI under 42 U.S.C. § 1983, which allows a person to sue a state official acting under color of state law for damages caused by a deprivation of a constitutional right. *See, e.g., Manuel v. City of Joliet*, 137 S. Ct. 911, 920 (2017); *Carey v. Piphus*, 435 U.S. 247, 254 (1978). Count IV is a *Monell* claim[6] seeking to hold the district liable for the individual defendants' constitutional violations based on a "*de facto* policy and widespread custom of not preventing or properly disciplining incidents of bullying on the basis of race, disparate disciplining and treatment on the basis of race, and insufficiently investigating bullying that occurs on the basis of race." Compl. ¶ 128. In count V, Doe pleads a § 1983 claim alleging that defendants violated his substantive due process rights. Compl. 30-36. In counts VI and VII, Doe

---

[6] *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978).

asserts an equal protection claim of race discrimination and a claim based on a "class of one" theory under *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). *See* Pl.'s Mem. Law in Supp. Resp. to Defs.' R. 56 Mot. Summ. J. ("Pl.'s Resp. Mem.") 17-22; ECF No. 60.

Finally, Doe brings a claim in count VIII under Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d et seq., for race discrimination in a federally funded program or activity. Compl. 45-47; *see generally Monroe v. Columbia Coll. Chi.*, --- F.3d ---, 2021 WL 1046554, at *1-2 (7th Cir. Mar. 19, 2021) (discussing text and purpose of Title VI).

Plaintiff initiated this case by filing his complaint in the Circuit Court of Cook County, Illinois. *See* Notice of Removal ¶ 1, ECF No. 1. Defendants removed the case to this court. *See* 28 U.S.C. § 1441(a). They alleged that this court had original jurisdiction over Doe's § 1983 and Title VI claims (counts IV–VIII) under 28 U.S.C. § 1331 because those claims arise under federal law. Notice of Removal ¶ 5. As for the claims under Illinois law in counts I–III, defendants invoked (Notice of Removal ¶ 6) the supplemental jurisdiction statute. *See* 28 U.S.C. § 1367(a).

## II. Summary Judgment Standard

Summary judgment must be entered if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At summary judgment, the court considers "all of the evidence in the record in the light most favorable to the non-moving party," and draws "all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Donald v. Wexford*

*Health Sources, Inc.,* 982 F.3d 451, 457 (7th Cir. 2020) (citing *Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018)).

The party seeking summary judgment bears the initial burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (explaining that Rule 56 "imposes an initial burden of production on the party moving for summary judgment to inform the district court why a trial is not necessary" (citation omitted)). After "a properly supported motion for summary judgment is made, the adverse party must" go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quotation omitted); *see also Modrowski*, 712 F.3d at 1169 (party opposing summary judgment "must go beyond the pleadings (*e.g.,* produce affidavits, depositions, answers to interrogatories, or admissions on file), to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in her favor" (citations and quotations omitted)).

### III. Federal Law Claims[7]

#### A. *Substantive Due Process Claim*

The Due Process Clause of the Fourteenth Amendment states: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The parties disagree about whether to analyze Doe's due process claim under the state-created danger doctrine. *See* Pl.'s Resp. Mem. 15–16.

Supreme Court doctrine differentiates between two types of due process claims: deprivations of procedural due process and "far more limited" substantive due process claims.

---

[7] The court has struggled to figure out what Doe is claiming, whether any law supports his claims, and what facts relate to which claims. The court struck an earlier round of summary judgment briefs and fact statements because of their manifest inadequacy. This round, on plaintiff's side, is almost as useless, but the court was unwilling to delay the progress of this case any further by soliciting more briefing.

*See Dunn v. Fairfield Cmty. High Sch. Dist. No. 225*, 158 F.3d 962, 965-66 (7th Cir. 1998).

Procedural "due process rules are meant to protect persons not from the deprivation, but from the

mistaken or unjustified deprivation of life, liberty, [or] property." *Zinermon v. Burch*, 494 U.S.

113, 125-26 (1990). Thus, a procedural due process claim "is not complete" when the plaintiff

has been deprived of life, liberty, or property. *Id.* at 126. Rather, the court must "ask what

process the state provided and whether it was constitutionally adequate." *Id.* Property interests

protected by procedural due process "are not inherent in the Constitution; '[r]ather, they are

created and their dimensions are defined by existing rules or understandings that stem from an

independent source such as state law.'" *Cheli v. Taylorville Cmty. Sch. Dist.*, 986 F.3d 1035,

1039 (7th Cir. 2021) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972))

(other citation omitted).

Substantive due process "prevents the government from engaging in conduct that 'shocks

the conscience,' . . . or interferes with rights 'implicit in the concept of ordered liberty.'" *Cnty.*

*of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998) (quotation omitted). The latter category of

"fundamental rights and liberty interests" receives "heightened protection against government

interference." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (quoting *Washington v. Glucksberg*,

521 U.S. 702, 720 (1997)) (other citation omitted). In contrast with procedural due process,

substantive due process "bars certain arbitrary, wrongful government actions 'regardless of the

fairness of the procedures used to implement them.'" *Zinermon*, 494 U.S. at 125 (quoting

*Daniels v. Williams*, 474 U.S. 327, 331 (1986)). The list of fundamental rights and interests

recognized by the Supreme Court "is, however, a short one, including things like the right to

marry, the right to have children, the right to marital privacy, the right to contraception, and the

right to bodily integrity." *Park v. Ind. Univ. Sch. of Dentistry*, 692 F.3d 828, 832 (7th Cir. 2012)

(citing *Washington*, 521 U.S. at 720). In part, this is because "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *Lewis*, 523 U.S at 843 (quoting *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997)). Typically, the Supreme Court has analyzed race discrimination claims under the Equal Protection Clause of the Fourteenth Amendment.[8] *See, e.g., City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 194-95 (2003); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 260-61 (1977).

Doe claims that he was deprived of a property interest in "a right to equal access to all benefits and privileges of a public education and a right to be free from said illegal practices and policies." Pl.'s Resp. Mem. 15; *see also* Compl. ¶ 147. This right, however, comes from Illinois law rather than the Supreme Court's jurisprudence on fundamental rights protected by substantive due process. *See Dunn*, 158 F.3d at 964 (collecting cases). Illinois law undoubtedly provides such a right, and if Doe had asserted a procedural due process claim, the court would be obliged to "delve into the nature of the property interest Illinois law creates in a public education." *Id.* But Doe explicitly invokes substantive due process and provides no analysis of Illinois law, so the court does not analyze procedural due process further. *Id.*

The defendants rely primarily on the substantive due process analysis in a gender-based case against school officials involving bullying allegations, *D.S. v. East Porter County Schools*

---

[8] Many of plaintiff's substantive due process arguments overlap with his equal protection arguments. The Seventh Circuit has held that to the extent the Equal Protection Clause provides a more specific source of constitutional protection to a plaintiff, the plaintiff's substantive due process arguments "are more properly considered claims under the equal protection clause alone." *Eby-Brown Co., LLC v. Wis. Dep't of Agric.*, 295 F.3d 749, 754 (7th Cir. 2002), (citing *Albright v. Oliver*, 510 U.S. 266, 273 (1994)). Because the parties have not briefed the interplay between plaintiff's equal protection and substantive due process claims, the court does not explore the issue further, but treats the issue consistently with plaintiff's treatment, alleging an equal protection violation or a violation of substantive due process.

*Corporation*, 799 F.3d 793 (7th Cir. 2015). In *D.S.*, the summary judgment record showed that the minor plaintiff had been bullied by her peers, including several incidents of physical bullying, beginning as early as the third grade and escalating into her middle school years. *See id.* at 796. She reported the bullying to school officials, but, apart from two incidents, she did "not know if school officials took any action in response to the complaints." *Id.*

The Seventh Circuit analyzed D.S.'s substantive due process claim against school district officials under the "general rule" set out in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 195 (1989). *See D.S.*, 799 F.3d at 798-99. Under *DeShaney*, the due process clause "prevents the state from infringing on an individual's right to life, liberty, or property, [but] it does not 'impose an affirmative obligation on the [s]tate to ensure that [life, liberty, or property] interests do not come to harm through other means.'" *Id.* at 798 (quoting *DeShaney*, 489 U.S. at 195). The Seventh Circuit asked whether either of the two recognized exceptions to this doctrine applied, state-created danger or a special relationship such as a custodial relationship. *See id.* The plaintiff argued that the "state-created danger exception" applied. *Id.* The "state-created danger exception" applies when a state actor's conduct "creates, or substantially contributes to the creation of, a danger or renders citizens more vulnerable to a danger than they otherwise would have been." *Id.* (citing *Reed v. Gardner*, 986 F.2d 1122, 1126 (7th Cir. 1993)).

To the extent the court understands Doe's claim, it is that school officials had an obligation to protect him from student-on-student or staff-on-student bullying and harassment. Doe contends, however, that his due process claim does not fall under the state-created danger doctrine. Pl.'s Resp. Mem. 15. He appears to be claiming that he was subjected to conduct that "shocks the conscience," giving rise to a substantive due process claim. He argues that a pair of

nonbinding district court decisions stand for the proposition that a "shocks the conscience" test applies without regard to the state-created danger doctrine. *See* Pl.'s Resp. Mem. 15–16. But Doe's claim is closely analogous to the claim in *DeShaney*: that state officials had an obligation to protect him from the dangers that surrounded him. The district court decisions Doe relies on are not inconsistent with *DeShaney*. They merely articulate the "shocks the conscience" standard in the context of a state-created danger claim. *See Doe v. Evergreen Park Elementary Sch. Dist. 124*, 2017 WL 6731867, at *6–7 (N.D. Ill. Dec. 29, 2017); *Eilenfeldt v. United C.U.S.D. #304 Bd. of Educ.*, 30 F. Supp. 3d 780, 790 (C.D. Ill. 2014).

Here, Doe predicates his substantive due process claim on (1) evidence he argues establishes "[t]he teachers and staff at Prospect encouraged and participated in bullying and harassing John Doe;" (2) the incident in which he was locked in the attendance office; and (3) his suspension and defendants' subsequent refusal to consider exonerating evidence presented by his mother. Pl.'s Resp. Mem. 16. Despite Doe's assertion to the contrary, the first argument falls clearly within the state-created danger exception, so it must be analyzed under that exception. *See First Midwest Bank ex rel. LaPorta v. City of Chicago*, 988 F.3d 978, 989 (7th Cir. 2021); *D.S.*, 799 F.3d at 798; *King ex rel. King v. E. St. Louis Sch. Dist. No. 189*, 496 F.3d 812, 819 (7th Cir. 2007).

### 1. *State Created Danger Analysis*

To succeed on a state-created danger theory, Doe must establish (1) that the state created or increased a danger that Doe faced; (2) that defendants' failure to protect Doe was the proximate cause of his injuries; and (3) that defendants' failure to protect Doe shocks the conscience. *D.S.,* 799 F.3d at 798 (citing *King*, 496 F.3d at 818). In *D.S.*, the Seventh Circuit held as a matter of law that the summary judgment record did not create a genuine fact issue on

plaintiff's argument "that school officials' inaction or ineffective responses to her reports of bullying increased the danger that she faced." 799 F.3d at 798–99. The Seventh Circuit pointed to D.S.'s testimony that, with two exceptions, she did not know whether school officials disciplined the alleged bullies after she complained to school officials. *Id.* at 798. Her assumption, the court of appeals held, that because "she didn't see school officials take more action, none occurred," did not suffice to survive summary judgment. *Id.* at 798–99. The *D.S.* plaintiff also cited evidence that staff "laughed when students moved D.S.'s desk in class, her gym teacher forced her to participate in gym class while injured because she didn't have a doctor's note, and . . . she felt that her athletic abilities were not appreciated by her coaches." *Id.* at 799. The court of appeals held that this evidence did "not satisfy the first element of the state-created danger exception and, even if [it] did, [it does] not rise to the requisite level of egregiousness to satisfy the third element," i.e., shocking the conscience. *Id.* (citing *Lewis*, 523 U.S. at 846). The Seventh Circuit therefore affirmed the entry of summary judgment dismissing the plaintiff's substantive due process claim. *Id.*

In this respect, the case at bar has much in common with *D.S.* Doe points to his and his mother's deposition testimony to support his contention that defendants did not take action on the reports they made of bullying and harassment. Defendants cite the testimony of school officials that they followed up on every report. *See* Resp. to SMF ¶¶ 24, 30, 31, 52, 53. Doe cites a portion of the following testimony from his mother's deposition to dispute the school officials' testimony (*see also* Resp. to SAF ¶¶ 50, 52):

> Q. And why aren't you satisfied with how Dean Taylor and Mr. Laakso handled the – and Mr. [sic] handled your complaints?
> A. It just wasn't handled, I mean, I can't.
> Q. Well, did they follow up with you?
> A. Sometimes.
> Q. Did they follow up with the students?

> A. No.
> Q. Was there, were there ever any punishments distributed?
> A. I don't know because I know as, according to them, me, as a parent, I'm not allowed to know what the discipline was for another student.

Mother Dep. 34:2-14, Pl.'s Ex. E, ECF No. 59-5.  Doe also relies on the following testimony from his own deposition (Resp. to SAF ¶ 50):

> Q.  . . . You also state here that the defendants did not observe, supervise, or investigate your reports to bullying with the same degree as the white students.
> A. Correct.
> Q.  Okay, so how do you know that they didn't investigate to the same degree?
> A. Because I still saw them the next day when stuff happened, like with Ben, so I saw him the next day.
>   . . .
> A. Because being blamed for something that I didn't do when it was brought forth to the table that it didn't happen and I still didn't get an apology or nothing, so that hurts, like –

Doe Dep. 216:4-13, 236:7-10, Pl.'s Ex. D, ECF No. 59-4.

Like the plaintiff in *D.S.*, Doe and his mother testified that they did not know whether or not school officials disciplined the students they reported for bullying, but they assume school officials did nothing because they were not told otherwise and Doe sometimes saw the bullies in school the next day.  As a matter of law, Doe and his mother's assumptions do not create a fact issue for trial.  *See D.S.*, 799 F.3d at 798-99.  Defendants have introduced evidence that district policy prohibited them from sharing the details of other students' discipline with Doe's mother. *See* Resp. to SOF ¶ 28.  Although the record shows that school officials sometimes violated this policy and shared discipline details with Doe's mother, *see id.*, the policy undermines the validity of Doe and his mother's assumptions that, because they were not told that a bully was disciplined, it did not happen.  Accordingly, Doe, like the plaintiff in *D.S.*, has failed to create a fact dispute over whether defendants' putative inaction created or increased the danger of student bullying.  *See* 799 F.3d at 798–99.

Doe also relies on two incidents to argue that defendants' failure to discipline teachers for their conduct toward him contributed to the bullying and harassment he experienced, largely from other students. *See* Pl.'s Resp. Mem. 16 (citing to SAF ¶¶ 53, 63, 83). The court does not understand Doe to be arguing that the conduct at issue in and of itself violated the Due Process Clause, but rather that school administrators' responses were inadequate. *See id.* The first incident is Sanecki striking Doe on the back of the head. It is undisputed that, although Sanecki's supervisor counseled her about this incident, she was not reprimanded and was permitted to remain in Doe's classroom until the end of the school year. *See* Resp. to SAF ¶¶ 52–54. In the second incident, a non-party teacher made Doe put gum on his head as a punishment in class. *Id.* ¶ 63.

A school official may be held liable under § 1983 and the Due Process Clause if the plaintiff can "show that the defendants created a risk of harm, or exacerbated an existing one." *T.E. v. Grindle*, 599 F.3d 583, 590 (7th Cir. 2010) (quoting *Nabozny v. Podlesny*, 92 F.3d 446, 460 (7th Cir. 1996)). Conversely, an official's "mere failure to act," with no evidence that the inaction created a risk of harm, does not violate the Due Process Clause. *Id.* (citation omitted). Even viewed favorably to him, the evidence Doe cites at most amounts to a failure to act. He cites no evidence indicating that either incident was witnessed by any student who later bullied or harassed Doe or that any bully knew about either incident. Thus, Doe has failed to cite sufficient evidence "from which a reasonable factfinder could conclude that the defendants' conduct increased the risk of harm to [Doe]." *Nabozny*, 69 F.3d at 460 (affirming entry of summary judgment).

2. *Locking Doe in the Attendance Office and Doe's Suspension*

In addition, Doe points to two incidents he claims independently violated his substantive due process rights: (1) the incident in which Doe was locked in a dark attendance office, and (2) school officials' failure to consider evidence Doe's mother attempted to bring to their attention during Doe's suspension. Pl.'s Resp. Mem. 17. The first incident, in which Doe was placed in the attendance office with the lights off, is properly analyzed under the Fourth Amendment as an unreasonable seizure. *See Wallace ex rel. Wallace v. Batavia Sch. Dist. 101*, 68 F.3d 1010, 1014–16 (7th Cir. 1995). Since Doe makes no Fourth Amendment argument, he has failed to create a fact issue based on this incident. *See* Pl.'s Resp. Mem. 16; *see also McCottrell v. White*, 933 F.3d 651, 670 n.12 (7th Cir. 2019) (underdeveloped arguments are waived).

With regard to Doe's suspension, Doe appears to be making what is clearly a procedural due process claim. But Doe does not bring a procedural due process claim. Nor does he argue procedural due process.[9]

### B. Equal Protection Claims

The Equal Protection Clause provides, "No State shall . . . deny to any person within its jurisdiction the equal protection of law." U.S. Const. amend. XIV, § 1. Doe contends that defendants violated the Equal Protection Clause in two distinct ways: (1) by discriminating against him based on his race; and (2) by discriminating against him because some district

---

[9] Section 1983 "does not extend the right to relitigate in federal court evidentiary questions arising in school disciplinary proceedings or the proper construction of school regulations. The system of public education that has evolved in this Nation relies necessarily upon the discretion and judgment of school administrators and school board members and § 1983 was not intended to be a vehicle for federal court correction of errors in the exercise of that discretion." *Wood v. Strickland*, 420 U.S. 308, 326 (1975), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982); s*ee also Tun v. Whitticker*, 398 F.3d 899, 904 (7th Cir. 2005); *Dunn, supra*, 158 F.3d at 965–66.

personnel found his mother intimidating and sought to avoid interacting with her.  *See* Pl.'s Resp. Mem. 17-23.  Doe labels the second claim a "class of one" claim.  *See id.* at 21-22; *see also Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2007).

Doe argues that defendants' conduct should be subject to strict scrutiny.  Strict scrutiny, the most exacting standard of review under the Equal Protection Clause, applies "if the state-crafted classification disadvantages a suspect class or 'impermissibly interferes' with a fundamental right."  *St. Joan Antida High Sch. Inc. v. Milwaukee Pub. Sch. Dist.*, 919 F.3d 1003, 1008 (7th Cir. 2019); *Segovia v. United States*, 880 F.3d 384, 390 (7th Cir. 2018)*.*  In the absence of a suspect class or a fundamental right, the test of rational basis review governs.  *St. Joan,* 919 F.3d at 1008 (citing *Armour v. City of Indianapolis*, 566 U.S. 673, 680 (2012))*; see also St. Joan,* 919 F.3d at 1008 n.3 (discussing intermediate scrutiny applied to quasi-suspect classifications).  The Supreme Court has held that education is not a fundamental right triggering strict scrutiny.  *Id.* at 1008 (citing *Kadrmas v. Dickinson Pub. Schs.*, 487 U.S. 450, 457–62 (1988)) (other citation omitted).  However, "[i]t is well established that when the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny."  *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007) (citing *Johnson v. California,* 543 U.S. 499, 505–06 (2005)) (other citation omitted).  Where strict scrutiny applies, a school district must demonstrate that its classification "is 'narrowly tailored' to achieve a 'compelling' state interest."  *Id.* (citing *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995)).  Under rational basis review, on the contrary, a legislative classification can be invalidated "only if there is no rational relationship between the classification and 'some legitimate government purpose.'"  *St. Joan,*

919 F.3d at 1010 (quoting *Segovia*, 880 F.3d at 390); *see also Armour,* 566 U.S. at 680

(discussing rational basis review).

To establish an equal protection claim, Doe "must demonstrate that (1) he is otherwise

similarly situated to members of the unprotected class; (2) he was treated differently from

members of the unprotected class; and (3) the defendant acted with discriminatory intent."

*Greer v. Amesqua*, 212 F.3d 358, 370 (7th Cir. 2000) (citing *Johnson v. City of Fort Wayne*,

91 F.3d 922, 944–45 (7th Cir. 1996)). When a law or policy classifies based on race on its face,

strict scrutiny applies, and "no inquiry into legislative purpose is necessary." *Hunt v. Cromartie*,

526 U.S. 541, 546 (1999) (citation omitted). Here, Doe does not argue that any of the district's

or school's written policies discriminate on their face. Rather, Doe argues that school and

district officials administered those policies in a discriminatory fashion. Pl.'s Resp. Mem. 22.

Therefore, Doe must establish defendants' "racially discriminatory intent or purpose" to "show a

violation of the Equal Protection Clause." *City of Cuyahoga Falls v. Buckeye Cmty. Hope*

*Found.*, 538 U.S. 188, 194 (2003) (quoting *Arlington Heights, supra,* 429 U.S. at 265); *see also*

*Nabozny*, 69 F.3d at 453–54.

"For discrimination claims . . . where the state of mind of purposeful discrimination is an

element of the violation, a supervisor is liable only if she had the specific intent to discriminate."

*Locke v. Haessig*, 788 F.3d 662, 669 (7th Cir. 2015) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676

(2009)). This rule applies to claims against school officials for their handling of complaints of

student harassment and teacher misconduct. *See T.E. v. Grindle*, 599 F.3d 583, 588–89 (7th

Cir. 2010) (school principal). Thus, to prevail on his equal protection claims, Doe "must show

that [defendants] intentionally discriminated against [him] and that there is no rational basis for

[defendants'] actions, or that [defendants] should have known that [their] discriminatory actions

lacked justification." *Park v. Ind. Univ. Sch. of Dentistry*, 692 F.3d 828, 833 (7th Cir. 2012)

(citing *Del Marcelle v. Brown Cnty. Corp.*, 680 F.3d 887, 889, 913 (7th Cir. 2012) (en banc))

(class of one claim); *accord T.E.*, 599 F.3d at 589 (gender discrimination); *Leslie v. Bd. of Educ.*

*for Ill. Sch. Dist. U-46*, 379 F. Supp. 2d 952, 961 (N.D. Ill. 2005) (citing *Keyes v. School Dist.*

*No. 1, Denver*, 413 U.S. 189, 198 (1973)) (other citation omitted; race discrimination claim).

The Seventh Circuit has made very clear what is necessary to create a genuine fact issue

on intentional discrimination, in the absence of direct evidence, specifically the need for

evidence of comparators. *See D.S., supra,* 799 F.3d at 799-800. The minor plaintiff in *D.S.*

alleged and testified that she was the victim of systematic years of escalating bullying by class

and teammates and that her complaints to school officials were met with indifference. *See id.*

at 796. The Seventh Circuit held that the plaintiff was required to produce evidence that she was

treated differently from "similarly situated" comparators. *Id.* at 799 (citing *Olech,* 528 U.S.

at 564). And to be "similarly situated," she and her comparators had to be "*prima facie* identical

in all relevant respects or directly comparable . . . in all material respects." *Id.* (quoting

*United States v. Moore*, 543 F.3d 891, 896 (7th Cir. 2008)). The court of appeals held that the

testimony of the plaintiff's father concerning what he overheard about another student's

treatment did not create a fact issue because there was no evidence that the comparator student

was sufficiently comparable to the plaintiff. *See id*. at 800.

The Seventh Circuit's decision in *Park* provides another example of what is required to

demonstrate that a comparator is similarly situated. There, the plaintiff, who was expelled from

dental school, compared herself to other college students whom she believed were disciplined

less harshly as part of a cheating scandal. *See Park*, 962 F.3d at 833. The court of appeals held

that, even though the case was at the complaint stage rather than the more demanding summary

22

judgment stage, the plaintiff had not shown that the other students were similarly situated: "We do not know, for example, whether these students, like Park, failed several classes, failed to schedule required remediation exams, engaged in unprofessional exchanges with their professors, and breached the university's confidentiality policy." *Id.*

Here, by contrast, Doe points to no comparator evidence at all.[10] *See* Pl.'s Resp. Mem. 18–22. To create a genuine issue of fact on intentional discrimination, Doe instead argues that "the testimony by John Doe and [his mother] is evidence of an issue of material fact that Defendants departed from [district and school] policies, singling out John Doe due to his race." Pl.'s Resp. Mem. 20. Doe cites his and his mother's testimony about several incidents in which they believe school or district staff treated him more harshly or with greater suspicion on account of his race and their perceptions of his mother. *See id.* at 18–22. These incidents range from Doe's suspension based on what he believes was falsified evidence to not being believed when he reported physical bullying in the halls until staff consulted a security camera recording that verified Doe's claims. *See* Resp. to SAF ¶¶ 32, 38, 47, 54, 64. As evidence that these incidents were discriminatory, Doe relies exclusively on his own testimony and that of his mother explaining why they believed the incidents were discriminatory. For example, regarding Doe's suspension, Doe's mother testified, "[I]f they took the word of a white girl [over Doe] and suspended [Doe] for nothing over a lie, why wouldn't they accept his [makeup] work?" Mother Dep. 64:14-16, cited in Resp. to SAF ¶ 66.

---

[10] Although the record contains evidence of students being suspended for using racial and anti-gay slurs against Doe, Doe does not suggest that these students' conduct is comparable to his conduct for allegedly inappropriately touching another student. *See* Pl.'s Resp. Mem. 18–22. Doe's attempt to show discriminatory discipline involving his sister cannot substitute for adequate comparator evidence involving Doe. Because Doe has cited no evidence from which a jury could reasonably conclude that similarly situated students received more favorable treatment than did Doe, this court must follow *D.S.*, and similar cases, and enter summary judgment in favor of the individual defendants on Doe's equal protection claim. *See D.S.*, 799 F.3d at 799–800; *Park*, 692 F.3d at 833; *Racine Charter One, Inc. v. Racine Unified Sch. Dist.*, 424 F.3d 677, 680 (7th Cir. 2005); *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1002, 1005 (7th Cir. 2004).

Doe further relies on defendants' alleged failure to follow up on reported instances of bullying and harassment.  There is no reason to doubt the sincerity and conviction of Doe's and his mother's testimony that they believed Doe experienced discrimination; but a witness's speculation about the defendant's motives generally does not suffice to create a genuine dispute for trial on the issue of intentional discrimination.  *See, e.g., Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 720 (7th Cir. 2008); *Mlynczak v. Bodman*, 442 F.3d 1050, 1058 (7th Cir. 2006) (employment discrimination cases).

Doe cites one Seventh Circuit case, *Nabozny v. Podlesny*, 92 F.3d 446 (7th Cir. 1996), to argue that he does not need to produce evidence of similarly situated comparators to create a fact issue.  *See* Pl.'s Resp. Mem. 17–19.  Contrary to plaintiff's argument, in *Nabozny* the summary judgment record contained "evidence . . . that [school officials] treated male and female victims differently."  *T.E.,* 599 F.3d at 588.  Indeed, the *Nabozny* court stated that the plaintiff's comparator evidence "regarding the defendants' punishment of male-on-female battery and harassment is not overwhelming" but it was nevertheless sufficient to withstand summary judgment.  *Nabozny*, 92 F.3d at 454–55.

### C.  *Title VI Claim*

Under Title VI of the Civil Rights Act of 1964, "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  Doe alleges in count VIII that he was discriminated against on the basis of his race, basically repeating the arguments in support of his other claims. In response to defendants' motion for summary judgment, Doe quotes the elements of a Title VI claim from *Doe v. Galster*, 768 F.3d 611, 617 (7th Cir. 2014), and then argues in full: "As stated

above, Plaintiff has shown Defendants had actual knowledge of severe, pervasive and objectively offensive discriminatory harassment. Defendants [sic] deliberate indifference to this harassment deprived Plaintiff of his access to education opportunities. Defendants [sic] Motion for Summary Judgment as to Count VIII should be denied." Pl.'s Resp. Mem. 25. In this case, the court struck plaintiff's first round of summary judgment briefing for failing to cite the LR 56.1 fact statements and develop his arguments. Since plaintiff has been duly warned, his failure to develop this argument makes application of the waiver doctrine all the more appropriate. *See, e.g.*, *McCottrell v. White*, 933 F.3d 651, 670 n.12 (7th Cir. 2019); *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011); *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 407–08 (7th Cir. 2007).

Putting waiver to one side for a moment, certain parts of the Title VI analysis are not difficult. A reasonable jury could conclude that the harassment and bullying Doe experienced from other students was based on his race. Just as the use of words like "bitch" and "whore" constitute "strong evidence that the harassment at issue is on the basis of sex," a reasonable jury could find that high school students' repeated use of the words "nigger" and other explicit racial slurs show harassment based on race. *Galster*, 763 F.3d at 617. Furthermore, a reasonable jury could find that some defendants had actual knowledge of these incidents. The record contains reports prepared by various school officials documenting alleged incidents involving Doe and incidents in which his mother reported student bullying of Doe. *See, e.g.,* Defs.' Ex. A-3, ECF No. 56-1; Defs.' Exs. B-7 and B-8, ECF No. 56-2. The record makes clear that at least those defendants who prepared the reports can be charged with actual knowledge. Furthermore, a jury could find that Doe's mother reported 30 to 50 incidents of the use of racist and anti-gay slurs by other students to school officials. *See* Resp. to SAF ¶¶ 18, 21, 22. The record does not make

clear, however, to whom the incidents were reported or the substance of the reports.  Nor does it

make clear the identity of the students or the time of the report.  While Doe and his sister

testified about other incidents, Doe cites no evidence that those incidents were reported to or

witnessed by school officials.  *See* Doe Dep. 269:24-271:9.

This lack of specificity makes it impossible for the court to determine if and when the

harassment became severe and pervasive enough to trigger a duty to act on the part of school

officials.  The Seventh Circuit conducted such an analysis in *Galster*, concluding that school

administrators knew about name-calling and other disputes, but the plaintiff did not produce

"evidence, however, that they knew before the last day of school about the much more severe

events that they did not witness."  763 F.3d at 618.  Because "[f]ederal law does not protect

students from commonplace schoolyard altercations, including name-calling, teasing, and minor

physical scuffles," the plaintiff did not demonstrate that school officials had actual knowledge of

conduct rising to the level of severe or pervasive harassment before her last day of school.  *Id*.

The same is true here.

### D.  *Monell Claim*

In count IV, Doe seeks to hold the district liable for the individual defendants'

constitutional violations.  *See* Compl. ¶ 144.  To hold the district liable for a § 1983 claim under

*Monell*, "plaintiff must challenge conduct that is properly attributable to the municipality itself."

*First Midwest Bank ex rel. LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021) (citing

*Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403–04 (1997)).  That is, Doe "must prove that

the constitutional violation was caused by a governmental 'policy or custom, whether made by

its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'"

*Id*. (citing *Monell*, 436 U.S. at 694).

Here, the court has determined that summary judgment is proper on all of Doe's § 1983 claims against the individual defendants. Doe bases his *Monell* claim on the same conduct on which he bases his due process and equal protection claims. *See* Pl.'s Resp. Mem. 23–24. Without an underlying constitutional violation, Doe's *Monell* claim necessarily fails as well. *See, e.g, LaPorta*, 988 F.3d at 986; *Swanigan v. City of Chicago*, 775 F.3d 953, 962 (7th Cir. 2015) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)); *Petty v. City of Chicago*, 754 F.3d 416, 424–25 (7th Cir. 2014).

### IV. Supplemental Jurisdiction

The dismissal of Doe's claims arising under federal law eliminates all of the claims over which this court has original jurisdiction under the federal question statute, 28 U.S.C. § 1331. Counts I-III of Doe's complaint arise under Illinois law, and those counts create a controversy among Illinois citizens over the scope and application of Illinois law. *See* Compl. ¶¶ 18–24.

Defendants premise this court's jurisdiction over Doe's state law claims on the supplemental jurisdiction statute. Notice of Removal ¶ 6. That statute provides, "[e]xcept as provided in subsections (b) and (c) . . . in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . ." 28 U.S.C. § 1367(a). Under § 1367(c), a court "may decline to exercise supplemental jurisdiction" over a claim in four circumstances, including where, as here, "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C § 1367(c)(3).

As the statute's use of the word "may" suggests, whether to decline supplemental jurisdiction is a discretionary decision. *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156,

173 (1997). "A federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." *Id.* (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). However, the Seventh Circuit has adopted "the sensible presumption that if the federal claims drop out before trial, the district court should relinquish jurisdiction over the state-law claims." *Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007) (citing *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999)); *accord Refined Metals Corp. v. NL Indus. Inc.*, 937 F.3d 928 (7th Cir. 2019). This presumption can be rebutted "when it is absolutely clear how the pendent claims can be decided." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 461 (7th Cir. 2020) (quoting *Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994)).

In the present case, the parties raise a variety of complex and sometimes difficult questions under Illinois law concerning the scope of liability for willful and wanton conduct under Illinois's Tort Immunity Act. *See generally* Defs.' Mem. Supp. Mot. Summ. J. 5-6, ECF No. 57; Pl.'s Resp. Mem. 3-10. In these circumstances, the presumption in favor of relinquishing supplemental jurisdiction is strong. These issues were not presented in any depth in the motion to dismiss plaintiff's complaint, and the court resolved no discovery disputes. Hence, "the economies from retaining jurisdiction over the state-law claims will be slight." *Williams Elecs.*, 479 F.3d at 907. Accordingly, the court relinquishes jurisdiction over Doe's state claims and remands them to the state court from which they were removed.

## V. Conclusion

For the reasons stated, defendants' motion for summary judgment is granted as to the federal claims and denied as to the state claims. The federal law claims in counts IV-VIII are dismissed. The court relinquishes supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3)

28

over counts I–III of plaintiff's complaint and remands this case to the Circuit Court of Cook County, Illinois.

Dated: April 2, 2021

_____/s/_____

Joan B. Gottschall
United States District Judge